# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01149-COA

**AKILAH DENISE WATSON A/K/A AKILAH D.**        **APPELLANT**
**WATSON A/K/A AKILAH WATSON**

**v.**

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/14/2024 |
| TRIAL JUDGE: | HON. STEVE S. RATCLIFF III |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAMON RAMON STEVENSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/26/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McCARTY AND WEDDLE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Following a jury trial in the Madison County Circuit Court, Akilah Watson was convicted of two counts of felony child abuse and sentenced to concurrent terms of twenty-five years in custody, with fifteen years to serve and ten years suspended. The trial court denied Watson's motion for a judgment notwithstanding the verdict (JNOV) or a new trial, and Watson appealed. Finding no reversible error, we affirm.

## FACTS

¶2. Akilah Watson is the mother of Anna (born in 2006) and Adam (born in 2007).[1] In

---

[1] We use fictitious names to protect the children's privacy.

October 2023, a Madison County grand jury indicted Watson for two counts of felony child abuse. Count I alleged that Watson struck Anna with a deadly weapon (a pistol). *See* Miss. Code Ann. § 97-5-39(2)(a)(vi) (Rev. 2020). Count II alleged that Watson whipped, struck, or otherwise abused Adam, causing him serious bodily injury. *See id.* § 97-5-39(2)(c)(iii). The indictment alleged that Watson committed both offenses between January 1, 2023, and July 6, 2023. Watson was also charged with three counts of intimidating a witness.[2]

¶3. At trial, Jo Oswald, an investigator with Child Protection Services (CPS), testified that she received an anonymous abuse report on July 6, 2023, alleging that Watson had placed an unloaded gun to Anna's head and pulled the trigger. Around 2 p.m., Oswald and two Ridgeland Police Department officers went to Watson's apartment to check on the children's welfare. Oswald informed Watson that an allegation of abuse had been reported and asked Watson if there was a gun in the home. Watson denied having a gun in the home. Anna informed the officers that Watson used a purple and black handgun, and the officers found a purple and black Taurus Spectrum handgun in a bag in Watson's bedroom. Oswald met with the children individually. Both children reported that they did not feel safe in the home, and Oswald observed scars and bruising on both. That same day, the Madison County Youth Court removed the children from Watson's home and placed them in CPS custody.

¶4. At trial, Anna testified that Watson put a gun to her head after she refused to give Watson her phone. She also testified that Watson had "pistol-whipped" her on a prior occasion, leaving a knot on her head. Anna testified that between January and July 2023,

---

[2] Watson was acquitted on all three counts of intimidating a witness; therefore, we limit our discussion of the facts related to those charges.

2

Watson would hit her with "a bat, stick, . . . belt, or extension cord." Watson would hit Anna with a belt "about three or four times a week" on her "back, . . . butt, hands, face, anywhere." In January 2023, Watson hit Anna in the back with a bat when she thought Anna had been lying about being at work. The next day, Watson "whooped" Anna on the butt with a belt after discovering that Anna had a "girlfriend." When Anna thought the whooping had ended and started to turn to face Watson, Watson struck Anna in the face with the belt buckle. Anna went to school that morning with a black eye, which school officials reported to law enforcement. Law enforcement had previously interviewed Anna at school in September 2022 when school officials reported marks on her arm. Anna told law enforcement that Watson had hit her with an extension cord, causing welts.

¶5.     Adam testified that he saw Watson strike Anna in the head with a gun after Watson discovered that Anna had used her vape. Adam also saw Watson hit Anna with a bat and a stick (the "prayer stick"). Adam testified that about a week before the July 6 CPS visit, Watson "whoop[ed]" him with an extension cord. Adam ran away from home once, but law enforcement returned him home. The night he returned home, Watson woke him around 3 or 4 a.m. while hitting him with a belt. Watson then locked him outside in his underwear in cold temperatures for several minutes. He stated that between January and July 2023, Watson struck him with an extension cord, a belt, and a stick. At trial, he still had marks and bruises from the abuse, including a mark from an extension cord and an imprint on his elbow from the prayer stick. Adam stated that he was often in pain the day after these incidents, and he remained in pain for several weeks after one particular beating. He stated that Watson

3

would hit him with a belt or extension cord "anytime she said [he] was disrespectful or . . . didn't do a chore."

¶6.    Anna confirmed that Watson would beat Adam with the stick if he didn't do his chores. She testified that early in the morning after Adam ran away, she heard "licks" when Watson hit Adam with the belt and then heard Adam screaming and crying while he was standing outside in the cold.

¶7.    Sha'nel Butler-Edwards testified that she made the report to CPS on July 6 after Anna's girlfriend told her about the incident with the gun. Sha'nel and Watson had been friends for over ten years, and Watson and the children often visited Sha'nel at her home in Atlanta. In November 2022, Sha'nel witnessed Watson punch Adam in the face several times because Watson thought Adam had lied about playing football. In June 2023, Anna and Adam visited Sha'nel in Atlanta, but Watson ended their visit early and took them back to Mississippi. Sha'nel believed Watson was angry with her because she supported Anna, whereas Watson disapproved of Anna's same-sex relationship. Sha'nel testified that Anna and Adam both told her that Watson had abused them.

¶8.    Sha'nel's sister, Ti-arah Davis, testified that the children also stayed with her during their visit to Atlanta in 2023. Ti-arah testified that Adam and Anna both told her that Watson had abused them.

¶9.    Watson testified in her own defense. Watson denied ever putting a gun to Anna's head or hitting her with a gun. Watson testified that before the alleged gun incident that led to the CPS report, she "confiscated three vapes and . . . a brownie" from a bag Anna had just

4

brought home from Atlanta. On the ride back from Atlanta the day before, Watson had suspected Anna was "high" because she was sleepy, quiet, and refused to take off her glasses. Watson stated she also found Anna talking to her girlfriend on another device after Watson had confiscated her phone. Watson admitted that a heated argument followed, but she denied pulling a gun on Anna. She stated that she had also told Oswald and the police officers on July 6 that she had never used a gun on Anna. However, Watson stated that she had never denied that there was a gun in the apartment.

¶10.     Watson admitted that she is "a disciplinarian" and uses corporal punishment. She denied ever hitting Anna or Adam with an extension cord. She testified that she administered corporal punishment by "whoop[ing] [the children] on their butt side" with an "old belt" for "maybe five or six licks." She said she might have accidentally hit the children's arms if she was "whooping" them with the belt and their arm "got in the way," and she admitted that she accidentally hit Anna in the face with the belt buckle in January 2023. She stated that she did not use corporal punishment at all from February to July 2023.

¶11.     Watson denied punching Adam in the face at Sha'nel's house in 2022. She explained that she grabbed Adam by the chest, put her hands in his face, and yelled at him because he was disrespecting her. She stated she rarely had to discipline Adam and would hit him only with a belt if she did physically discipline him.

¶12.     Watson's father testified that Anna and Adam spent time at his house and had never said anything to him about any abuse. Watson's mother testified that she never saw Watson administer corporal punishment to the children.

5

¶13. The jury found Watson guilty of two counts of child abuse but acquitted her of all three counts of intimidating a witness. The trial court sentenced Watson to concurrent terms of twenty-five years in the custody of the Department of Corrections, with fifteen years to serve and ten years suspended. Watson filed a motion for JNOV or a new trial, which was denied, and a notice of appeal.

## DISCUSSION

¶14. On appeal, Watson argues that the trial court erred by allowing testimony about incidents of abuse other than those charged in the indictment; that the evidence was insufficient to prove Count I; and that her trial counsel provided ineffective assistance.

### I. Evidence of Other Incidents of Abuse

¶15. Watson argues that the trial court erred by allowing testimony about incidents of abuse other than those charged in the indictment. She argues that this evidence violated Mississippi Rules of Evidence 404(b) and 403 and her due process rights. Specifically, Watson takes issue with testimony about times she allegedly beat Anna with a belt, stick, or extension cord and testimony that she held a gun to Anna's head. She also argues the testimony that she allegedly punched Adam in November 2022 was inadmissible.

¶16. Prior to trial, the State filed a notice of intent to introduce testimony and evidence under Rule 404(b), including evidence of multiple prior incidents of abuse against Anna and Adam. Watson did not file any written objection or response to the State's notice. When the State raised the issue at the pretrial hearing, defense counsel "ask[ed] that it be heard more contemporaneous to trial," and the court agreed to "take it up at trial." The State then noted

6

for the record that Watson was on notice that the State intended to elicit testimony from the children and offer additional evidence of prior incidents of abuse other than those charged in the indictment. During trial, Watson did *not* object to any testimony or other evidence regarding prior, unindicted incidents of abuse. During the jury instruction conference, the parties agreed on a limiting instruction regarding such evidence, which the court gave. Thereafter, the State noted—and defense counsel did not dispute—that the defense had not made any objections to the evidence during the course of the trial.

¶17. As the State points out, Watson waived any objection to the testimony by failing to object at trial. *Foster v. State*, 639 So. 2d 1263, 1270 (Miss. 1994) ("This Court has repeatedly held that if no contemporaneous objection is made, the error, if any, is waived." (brackets and quotation marks omitted)). Watson does not dispute that she waived the issue by failing to object at trial, but she argues that the introduction of evidence of unindicted instances of abuse was "plain error" and is cause for reversal.

¶18. "The plain error doctrine is employed only in situations when a defendant's substantive or fundamental rights are affected." *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016) (quotation marks omitted). "Plain-error review is properly utilized for correcting *obvious* instances of injustice or misapplied law." *Id.* (quotation marks omitted). "[I]n order to determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether the error has prejudiced the outcome of the trial." *Id.* (brackets and quotation marks omitted).

¶19. We have previously observed that no "legal rule" requires a trial judge to sua sponte

7

exclude Rule 404(b)-type evidence in the absence of a timely objection. *Pinter v. State*, 221

So. 3d 378, 384-85 (¶¶12-13) (Miss. Ct. App. 2017). We stated,

> Such testimony may be admissible depending on its purpose, *see* M.R.E.
> 404(b)(2), and whether to object to it is a decision left to the discretion of trial
> counsel, who may have strategic reasons for not objecting. As such, the trial
> judge . . . did not deviate from any "legal rule" by not inserting himself into the
> role of defense counsel and striking or prohibiting the testimony sua sponte.

*Id.* at 385 (¶13) (brackets, quotation marks, and citation omitted).

¶20. "Rule 404(b)(1) of the Mississippi Rules of Evidence prohibits the use of prior-bad-

acts evidence to prove a person's character to show that he acted in conformity therewith."

*Smith v. State*, 326 So. 3d 510, 517 (¶20) (Miss. Ct. App. 2021). However, "Rule 404(b)

evidence may be used for another purpose, such as to show 'motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" *Id.* at 517-

18 (quoting MRE 404(b)(2)). As the State argues, evidence of incidents other than those

described in the indictments could have been offered to show motive, intent, or a lack of an

accident or mistake, *see* MRE 404(b)(2), or "to tell a rational and coherent story of what

happened" to the children. *Walker v. State*, 407 So. 3d 1027, 1037 (¶39) (Miss. 2025).

These issues and the permissible uses of the evidence were not addressed at trial precisely

because Watson failed to object at any point prior to or during trial. In this context, we

certainly cannot say that the trial judge deviated from any clear "legal rule" by not excluding

such evidence sua sponte. Accordingly, this issue is waived and without merit.

## II. Sufficiency of the Evidence

¶21. Watson also argues that the State failed to present sufficient evidence to sustain her

conviction for the felony child abuse of Anna. Specifically, Watson contends that the State failed "to prove that the beating with the gun occurred between January 1, 2023, and July 6, 2023," the dates alleged in Count I of Watson's indictment. This is Watson's *only* challenge to the sufficiency of the evidence.[3]

¶22. We review challenges to the sufficiency of the evidence de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). "We view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors *could have found* that the State proved each essential element of the crime." *Poole v. State*, 46 So. 3d 290, 293 (¶20) (Miss. 2010) (quotation marks and brackets omitted). "[A]ll credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Johnson*

---

[3] The State argues that Watson waived this issue. After the State rested its case-in-chief, Watson's attorney moved for a directed verdict as to Count I but simply stated: "[W]e . . . ask for a directed verdict on Counts I, II, and III. We believe the State has not provided a prima facie case to meet all the elements of those three [counts], so we ask for a directed verdict . . . ." Watson did not renew her motion at the close of the evidence but did submit a simple peremptory instruction, which the trial court refused. Post-trial, Watson's motion for JNOV made only conclusory assertions that the trial court erred by failing to grant her motion for a directed verdict, that "[t]he State failed to prove its case beyond a reasonable doubt," and that the verdict was "contrary to the evidence." Our Supreme Court has held that "[a] motion for a directed verdict on the grounds that the state has failed to make out a prima facie case must state specifically wherein the state has failed to make out a prima facie case. Motions for a directed verdict must be specific and not general in nature." *Sheffield v. State*, 749 So. 2d 123, 126 (¶10) (Miss. 1999) (quoting *Banks v. State*, 394 So. 2d 875, 877 (Miss. 1981)). Post-trial motions for JNOV require the same specificity. *Id.* A defendant is "procedurally barred" from raising new issues on appeal that he failed to raise in his motion for a directed verdict or JNOV. *Id.*; *accord Carpenter v. State*, 400 So. 3d 493, 501-02 (¶29) (Miss. Ct. App. 2024), *cert. denied*, 398 So. 3d 874 (Miss. 2025). In the trial court, Watson failed to raise any issue regarding the dates in Count I of her indictment or the proof thereof. Nonetheless, we address the issue on the merits.

9

*v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole*, 46 So. 3d at 293-94 (¶20). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all elements of the offense." *Williamson v. State*, 375 So. 3d 1158, 1167 (¶19) (Miss. Ct. App. 2023) (citing *Poole*, 46 So. 3d at 293-94 (¶20)).

¶23. Count I of Watson's indictment charged her with felonious child abuse in violation of Mississippi Code Annotated section 97-5-39(2)(a)(vi), which provides in part:

> Any person shall be guilty of felonious child abuse in the following circumstances:
>
> (a) Whether bodily harm results or not, if the person shall intentionally, knowingly or recklessly:
>
> . . . .
>
> (vi) Use any type of deadly weapon upon any child[.]

Miss. Code Ann. § 97-5-39(2)(a)(vi). Count I of the indictment specifically alleged that "between January 1, 2023[,] and July 6, 2023," Watson "intentionally, knowingly, or recklessly use[d] a deadly weapon upon [Anna] . . . by striking her with a pistol."

¶24. Anna testified that Watson "pistol whipped" her, i.e., that Watson "took the end of [Watson's] gun and hit [Anna] a couple of times with it on [Anna's] head." Anna testified that Watson struck her because she "took [Watson's] vape without [Watson's] permission." Anna testified that the incident occurred in Watson's bedroom and that Adam was also present. Adam corroborated Anna's testimony. He testified that Watson struck Anna in the

10

head with a pistol because Anna had taken something from Watson and that the incident occurred in Watson's bedroom. He testified that Anna was "trying to cover her face," but Watson struck Anna with the pistol and left "a knot on top of [Anna's] head." For her part, Watson acknowledged that she had a loud, heated argument with Anna about a vape. Watson admitted that during the argument, she "pushed [Anna] down on the bed" and "sat on top of her literally." Watson identified this argument as the incident when she "supposedly pistol whipped" Anna, but Watson denied that she ever possessed or used a gun during the incident. Watson testified that the incident took place on "January 28th or 29th," and she stated that Anna "even went to school that Monday," so someone would have noticed if there had "been a mark or something on her head."

¶25.    In summary, both Anna and Adam testified that Watson pistol-whipped Anna during an argument in Watson's bedroom, and although Watson denied striking Anna, Watson herself testified that the altercation at issue occurred during the time period alleged in the indictment. Viewing the evidence in the light most favorable to the State, a rational juror could have found beyond a reasonable doubt that Watson pistol-whipped Anna during the period alleged in the indictment. Therefore, the evidence is sufficient to support the conviction, and the trial court did not err by denying Watson's motion for JNOV.

¶26.    Moreover, although "an indictment must contain the essential elements of the offenses charged in order to provide the defendant with sufficient notice of the charges against him," "'an allegation of the date of the offense is not an essential element of the offense charged in the indictment.'" *Humbles v. State*, 228 So. 3d 838, 844 (¶22) (Miss. Ct. App. 2017)

11

(quoting *Mosby v. State*, 134 So. 3d 850, 853 (¶11) (Miss. Ct. App. 2014)). When time is not an essential element of the offense, "within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient" to sustain the conviction. *Garlington v. State*, 349 So. 3d 782, 797 (¶41) (Miss. Ct. App. 2022) (quoting *Daniels v. State*, 742 So. 2d 1140, 1143 (¶10) (Miss. 1999), *overruled on other grounds by Wilson v. State*, 194 So. 3d 855 (Miss. 2016)).[4] An incorrect date, or a failure to prove a date, in an indictment is not grounds for reversal unless it caused unfair prejudice to the defendant, for example, because he was unfairly surprised or lacked notice of the substance of the charges against him. *McBride v. State*, 61 So. 3d 138, 150 (¶48) (Miss. 2011).

¶27. Here, there is no showing of unfair prejudice to Watson. It is evident from her testimony at trial that she understood when the incident at issue occurred, and she did not assert any sort of alibi defense. Rather, Watson simply denied that she ever struck Anna with a pistol. Accordingly, the proof at trial was sufficient to uphold Watson's conviction "even if the dates alleged in the indictment had been incorrect," *id.* (¶47) (citing *Daniels*, 742 So. 2d at 1143 (¶10)), and the trial court did not err by denying Watson's motion for JNOV.

### III. Ineffective Assistance of Counsel

¶28. In her last issue on appeal, Watson argues that her trial counsel provided ineffective assistance by failing to object to the evidence of unindicted incidents of abuse discussed in Part I, *supra*.

¶29. "Generally, ineffective-assistance-of-counsel claims are more appropriately brought

---

[4] There is no statute of limitations for felony child abuse. *See* Miss. Code Ann. § 99-1-5(1)(a) (Rev. 2020).

during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (brackets omitted). "This Court will address such claims on direct appeal when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge . . . are not needed." *Id.* (quotation marks omitted). We may also address such "claims on direct appeal when the record affirmatively shows that the claims are without merit." *Id.*

¶30. However, "[i]t is unusual for this Court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal. This is because we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim." *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002). If the record on direct appeal is insufficient to address the defendant's ineffective assistance claims, we will "dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief." *Sandlin v. State*, 156 So. 3d 813, 819 (¶20) (Miss. 2013).

¶31. To prevail on an ineffective assistance claim, the defendant must show *both* (1) "that counsel's performance was deficient"—i.e., "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"—*and* (2) that he was prejudiced as a result—i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove prejudice, "[t]he defendant

13

must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The defendant "bears the burden of proving both prongs of *Strickland*." *Ravencraft v. State*, 989 So. 2d 437, 443 (¶31) (Miss. Ct. App. 2008). "If either prong is not met, the claim fails." *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006).

¶32.    In addition, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In general, "the failure of counsel to make certain objections may fall within the ambit of trial strategy, and therefore may not give rise to a claim for ineffective assistance of counsel." *Morrow v. State*, 275 So. 3d 77, 84 (¶25) (Miss. 2019).

¶33.    Here, the record is insufficient to address Watson's claim on direct appeal. Because Watson did not object at trial to any evidence of unindicted incidents of abuse, the State was not required to articulate why such evidence was admissible under Rule 404(b) or otherwise. Therefore, the record does not show the specific purposes for which the evidence was offered. In addition, we do not know whether defense counsel had strategic reasons for not objecting despite receiving pretrial notice that such evidence would be offered. Under these circumstances, we conclude that the record is insufficient to address Watson's claim. Therefore, we decline to address the claim on the merits without prejudice to Watson's right to raise the claim in a properly filed motion for post-conviction collateral relief. *Sandlin*, 156 So. 3d at 819 (¶20).

**CONCLUSION**

¶34.    In sum, the State presented sufficient evidence to support Watson's conviction of Count I, and admitting the testimony and other evidence regarding unindicted incidents of abuse was not plain error. We decline to address Watson's ineffective-assistance-of-counsel claim without prejudice to her right to raise that claim in a motion for post-conviction relief.

¶35.    Accordingly, Watson's convictions and sentences are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**